## ROTH v DEPARTMENT OF NATURAL RESOURCES
### Case No. 88-2058

State of Florida, Division of Administrative Hearings

October 31, 1988

### APPEARANCES OF COUNSEL

**David L. Manz,** for petitioner.

**Ross S. Burnaman,** for respondent.

### OPINION OF THE COURT

LINDA M. RIGOT, Hearing Officer.

*RECOMMENDED ORDER*

Pursuant to notice, this cause was heard by Linda M. Rigot, the assigned Hearing Officer of the Division of Administrative Hearing, on August 24, 1988, in Key West, Florida.

On March 17, 1988, Respondent issued a Notice of Violation and Order for Corrective Action alleging that Petitioner was engaged in the unauthorized use of sovereignty submerged lands adjacent to Fat Deer Key, Monroe County, Florida, and that Petitioner had damaged, and

was damaging, those lands. Petitioner timely requested a formal hearing on the allegations contained within that Notice of Violation and Order for Corrective Action. Accordingly, the issue for determination herein is whether Petitioner is guilty of those allegations, and, if so, what action should be taken against Petitioner, if any.

Petitioner testified on his own behalf and presented the testimony of George Lawrence. Respondent presented the testimony of the Petitioner, Herbert Grant Gelhardt IV, and James M. Marx. Additionally, Respondent's Exhibits numbered 1-5 and 7-15 were admitted in evidence.

Although Petitioner requested and was granted leave to take and file the deposition of Peter Jones after the conclusion of the final hearing, Petitioner failed to do so.

Although both parties requested and were granted leave to file proposed findings of fact in the form of proposed recommended orders, only Respondent did so. Respondent's proposed findings of fact numbered 1-17 have been adopted in substance in this Recommended Order.

## FINDINGS OF FACT

1. Sunset Company of Wilton, Incorporated, is the record title owner of a parcel of real property in Government Lot 1, Section 5, Township 66 South, Range 33 East, on Crawl Key No. 3 also known as Fat Deer Key, Monroe County, Florida.

2. A portion of that parcel has been conveyed by Sunset Company to Whaler's Plaza, Incorporated, although that deed may not have been recorded.

3. Petitioner Fred Roth owns and controls both corporations and exerts ownership and control over the entire parcel.

4. The submerged lands in Tarpon Creek which are waterward of the line of the mean high water contiguous to the parcel are sovereignty submerged lands.

5. Roth received "major development" approval from Monroe County to develop the parcel by constructing a commercial/retail development known as "Whaler's Plaza." The major development plan submitted to and approved by Monroe County includes a docking facility.

6. In 1979 Roth filed an application with the Florida Department of Environmental Regulation for a private dock facility at Whaler's Plaza. The Department of Environmental Regulation approved that applica-

tion and issued to Roth Permit/Certification No. 44-18542-5E. Roth never constructed that docking facility, and the permit expired on August 1, 1980.

7. One of the agencies involved in reviewing that permit application was the Respondent. On June 26, 1979, Respondent notified Roth that upon review of the application in DER File No. 44-18542-5E, it had determined that the submerged lands were state-owned but that no lease agreement with Respondent would be required.

8. After Permit No. 44-18542-5E expired on August 1, 1980, the Department of Environmental Regulation directed a letter to Petitioner advising him that the permit had expired and further advising him that if he wished to pursue the project he would have to obtain a new permit.

9. In October 1983 Roth sought new authorization from the Department of Environmental Regulation and Respondent to construct a docking facility at Whaler's Plaza. His application was assigned DER File No. 440774875.

10. On December 29, 1983, Respondent notified Roth that a lease would be required for the use of state-owned lands contiguous to Whaler's Plaza, relative to DER File No. 440774875. Respondent's rules changed in 1982 so that Roth's docking facility would be required to meet new criteria.

11. The docking facility proposed by Roth in 1983 was similar to the docking facility proposed in 1979. The 1983 proposed modified docking facility was still represented to the Department of Environmental Regulation to be a private boat dock. The Department of Environmental Regulation issued an intent to deny the 1983 application under its then-existing rules, and Roth requested a formal hearing on that preliminary denial. Before a final hearing could be conducted, Roth again modified the proposed docking facility so that he qualified for a dredge and fill permit exemption from DER, so that no DER permit was needed for his project. A final order was entered by the Department of Environmental Regulation on August 27, 1985.

12. While Roth's 1983 application was pending before the Department of Environmental Regulation, Roth was processing his application with Respondent for a submerged land lease for the docking facility. The documents he filed with Respondent, however, indicated that the docking facility was not intended to be a private dock but rather was a dock related to the commercial development at Whaler's Plaza. Roth represented to Respondent that the proposed docking facility would be for the convenience of patrons of the stores and

restaurant at Whaler's Plaza and for his own personal use. Specifically, on June 3, 1985, Roth directed a letter to Respondent pursuant to Respondent's request for additional information. He described the Whaler's Plaza docking facility as follows:

The wood dock will be used for arriving and departing customers of the restaurant and stores and my own personal use.

The upland land use and activities of the property—will be developed into a shopping center. At the present time, the first phase is completed which is a one-story building containing four units, housing six retail stores, plus offices. The next phase will consist of three more buildings having five units each, 1,000 [sic] sq. ft. each unit which will be for retail stores and offices, and the final phase will be a 200 seat restaurant, a minature [sic] petting zoo and possibly a miniature golf course.

\* \* \*

. . . 70% of the slips will be open to the general public for their convenience in patronizing the restaurant and stores; the remaining 30% of the slips will be for my own personal use.

13. Roth never completed the lease application he filed with Respondent, and he failed to obtain approval for the use of the sovereignty submerged lands preempted by the docking facility proposed in DER File No. 440774875. Eventually, his pending application with Respondent was deactivated, and the file was closed.

14. In late 1986, Roth initiated construction of his docking facility on sovereignty submerged lands, and he caused 30 pilings with cross-bracing to be placed into the submerged lands. On September 1, 1986, Grant Gelhardt, one of Respondent's enforcement officers, discovered the dock being constructed and verbally instructed Roth, through Mrs. Roth, to immediately cease construction activity. No further construction has taken place.

15. Despite the verbal notification, a subsequent warning notice sent by certified mail, and Respondent's Notice of Violation and Order for Corrective Action, Roth has failed to remove the pilings and/or to take corrective measures regarding the partially completed docking facility.

16. Roth has allowed vessels to be moored at the partially completed docking facility, has moored his own vessels at the partially completed docking facility, and has failed to prevent other persons from mooring at the partially completed docking facility. Roth's actions have resulted in damage to a benthic seagrass community on the adjacent sovereignty submerged lands over which Roth's partially completed docking facility

238

is located, and over which vessels using the facility have been and would be moored. Those submerged lands constitute a benthic community of seagrass which supports various fauna and which would be adversely affected by completion and operation of the docking facility. The water depths in the area are shallow, with areas of less than -4 feet mean low water.

17. The width of Tarpon Creek in the project area is approximately 100 feet.

18. The length of the partially completed docking facility is approximately 150 feet.

19. Although the dock extends parallel to the shore, the distance the dock extends into Tarpon Creek, as measured from the shoreline, is approximately 35 feet.

20. Roth knowingly trespassed on sovereignty submerged lands by initiating construction of the docking facility, and he has willfully damaged those lands by drilling holes and placing pilings, and by allowing moored vessels to shade the seagrass.

21. Although Roth ceased construction of the docking facility when told to stop, he has failed to attempt to resolve the violation, to remove the pilings, to seek an after-the-fact approval, or to cease all mooring of vessels on sovereignty submerged lands adjacent to the uplands, even subsequent to receiving the Notice of Violation and Order for Corrective Action.

22. Respondent's June 26, 1979 letter to Roth authorized the activities described in DER Permit No. 44-18542-5E, for the period authorized by that permit. Roth knew that the DER permit, and therefore Respondent's approval to engage in the activity authorized by that permit, had expired. Roth further knew that his new application filed in 1983, DER File No. 440774875, which was approved by DER after Roth further modified it in order to qualify for an exemption, did not exempt him from obtaining authorization from Respondent to use sovereignty submerged lands for the project and further knew that when he commenced construction of the docking facility in 1986 that he had not obtained approval from Respondent to use state-owned submerged lands.

23. Roth offered no evidence to demonstrate any detrimental reliance upon the June 26, 1979, DNR letter, and the letter did not create a vested right for Roth to construct a different docking facility at a later time without authorization from Respondent.

24. The uplands at the Whaler's Plaza commercial/retail develop-

ment are owned by for-profit corporations which Roth controls and which derive income from the business and commercial activities at Whaler's Plaza. The docking facility intended primarily for the use of customers of Whaler's Plaza would therefore constitute a revenue generating/income related activity.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction over the subject matter hereof and the parties hereto. Section 120.57(1), *Florida Statutes.*

Respondent is the state agency whose Division of State Lands serves as staff to the Board of Trustees of the Internal Improvement Trust Fund, State of Florida. Section 253.002, *Florida Statutes* (1987). The Trustees hold title to sovereignty submerged lands in tidal waterbodies. Article X, Section 11, *Florida Constitution* (1968) and Sections 253.003 and 253.012, *Florida Statutes* (1987).

Section 253.77(1), *Florida Statutes* (1987), prohibits "excavation, construction, or other activity involving the use of sovereign . . . lands . . . until such person has received from the Board . . . the required lease, license, easement, or other form of consent authorizing the proposed use." Petitioner willfully violated Section 253.77(1), *Florida Statutes* (1987).

Chapter 18-21, *Florida Administrative Code,* provides the procedures, standards, policies, criteria and application requirements for the use of sovereignty submerged lands. Roth's partially completed docking facility is not eligible for a submerged land lease in that there are benthic communities present where the boat mooring area is and would be located, there are depths of less than −4 feet mean low water present, and its length preempts greater than 20% of Tarpon Creek, the affected waterbody. Rule 18-21.0041(1)(b)3., 4.b., and 9., *Florida Administrative Code.*

By initiating construction, excavating, and maintaining structures on state-owned lands with actual knowledge that he lacked the requisite approval; and by allowing vessels to moor on the unauthorized facility, resulting in damage to the seagrass constituting a benthic community. Roth has willfully violated Rules 18-14.003(4) and (6), *Florida Administrative Code.*

Rules 18-14.002 and 18-14.005, *Florida Administrative Code,* provide for the assessment of fines for willfully damaging state land and

**240**

for willfully violating the provisions of Chapter 253, *Florida Statutes,* and they establish the procedures for the imposition and collection of fines. Rule 18-14.002(4) provides that a fine ranging between $1 and $2500 shall be imposed for a first offense, although fines for first offenses may exceed $2500 upon approval by the Board. In its proposed recommended order, Respondent recommends a fine of $10,000. Respondent failed to offer any evidence in support of its position that the normal guidelines for first offenses should be exceeded; rather, the only evidence offered by Respondent in this cause was the evidence necessary to prove the statutory and rule violations found herein. On the other hand, imposition of a fine at the top of the range for first offenses is appropriate in view of the fact that Petitioner was not ignorant of the requirement that he receive approval to construct his docking facility; rather, Petitioner is well aware of the requirement and actually processed an application for approval which he failed to complete. Lastly, although Petitioner ceased construction when discovered by Respondent's enforcement officer, he has failed to take any corrective action and continued to allow vessels to moor at the unauthorized docking facility even after being served with Respondent's Notice of Violation and Order for Corrective Action.

## RECOMMENDATION

Based upon the foregoing Findings of Fact and Conclusions of Law, it is,

RECOMMENDED that a Final Order be entered requiring Petitioner to:

(1) Remove the unauthorized structure within 20 days from the date on which the Final Order is entered and in accordance with Respondent's supervision of that removal;

(2) Immediately cease all mooring of vessels on sovereignty submerged lands adjacent to the uplands of the parcel known as Whaler's Plaza until authorized to use state-owned lands; and

(3) Pay of a fine of $2500 within 15 days of receipt of a certified letter from the Executive Director of the Department of Natural Resources demanding payment to the Internal Improvement Trust Fund.

DONE and RECOMMENDED this 31st day of October, 1988, at Tallahassee, Florida.